AO 91 (Rev. 11/11) Criminal Complaint                                      AUSA Matthew Hernandez (312) 353-4317

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ROBERT GOODSON;
RONALD R. BROOKS,
also known as "Red," "Big Bro," and "G man";
RONNIE R. MARTIN,
also known as "Bo"; and
ZHANE KIND

CASE NUMBER:
**UNDER SEAL**

**FILED**

SEP 13 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**17CR 597**

MAGISTRATE JUDGE MASON

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

**Code Section**

Title 21, United States Code, Section 841(a)(1).

**Offense Description**

On or about March 9, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, ROBERT GOODSON, knowingly distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

### Count Two

**Code Section**

Title 21, United States Code, Section 841(a)(1).

**Offense Description**

On or about March 9, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, RONALD R. BROOKS, knowingly distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## Count Three

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1). | On or about March 9, 2017, at Chicago, in the Northern District of Illinois, and elsewhere, defendants RONNIE R. MARTIN and ZHANE KIND knowingly and intentionally possessed with intent to distribute a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____

CHRISTIANA A. OLAGBAIYE
Special Agent, Drug Enforcement Administration (DEA)

Sworn to before me and signed in my presence.

Date: September 13, 2017

_____
*Judge's signature*

City and state: Chicago, Illinois

MICHAEL T. MASON, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | ss

## **AFFIDAVIT**

I, CHRISTIANA A. OLAGBAIYE, being duly sworn, state as follows:

1.     I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since October 2015. My current responsibilities include the investigation of narcotics trafficking offenses. I am currently assigned to the DEA Chicago Field Division.

2.     As part of my training to become a Special Agent, I received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking.  I have also participated in multiple investigations involving illegal drug trafficking.  Based on my training and experience, I am familiar with the ways in which drug traffickers conduct their drug trafficking business, including, but not limited to, their methods for concealing narcotics, packaging narcotics, and distributing narcotics.  My current responsibilities include the investigation of narcotics trafficking offenses and money laundering offenses.

3.     This affidavit is submitted in support of a criminal complaint alleging that on March 9, 2017, ROBERT GOODSON, RONALD R. BROOKS, also known as "Red," "Big Bro," and "G man," RONNIE R. MARTIN, also known as "Bo," and ZHANE KIND have violated Title 21, United States Code, Section 841(a).  Because

this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging: (1) GOODSON and BROOKS with distribution of heroin; and (2) MARTIN and KIND with possession with intent to distribute heroin, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

4.    This affidavit is based upon my personal knowledge and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) wire and electronic communications intercepted pursuant to court order; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) information obtained from witnesses, including confidential sources; (e) telephone records, including subscriber information and toll records; (f) law enforcement databases; (g) documents and other records produced pursuant to grand jury subpoena; and (h) admissions made by MARTIN and KIND.

## Background of the Investigation

5.    In summary, in 2014, a DEA confidential source ("CS-1")[1] identified an individual he/she knew as "Red," later identified as BROOKS, as supplying him/her

---

[1] CS-1 has been cooperating with law enforcement since in or around June 2014. CS-1 multiple felony drug convictions. CS-1 was charged with narcotics distribution and has since had those charges dismissed in exchange for his/her cooperation. CS-1 has received reimbursements in the amount of approximately $1500 from law enforcement for expenses associated with his/her cooperation in this investigation. CS-1 has provided timely and accurate information that has been corroborated by law enforcement through controlled buys, consensual recordings, Title III intercepts, phone records, and law enforcement reporting.

with kilogram quantities of heroin in the Milwaukee area between March and May 2014. Between October 2014 and June 2016, at the direction of law enforcement, CS-1 purchased a total of approximately 225 grams of heroin from BROOKS, and others acting at BROOKS's direction, over the course of five transactions. Those transactions are the subject of a pending Milwaukee County District Attorney's Office investigation.

6.      At various times between February 17, 2017, and March 18, 2017, DEA intercepted wire and electronic communications over 618-353-4636 ("Target Phone 1"), which was being used by BROOKS, pursuant to an interception order signed by U.S. District Court Chief Judge Rubén Castillo. During that period, law enforcement intercepted communications pertaining to the following drug transactions: (1) on March 3, 2017, GOODSON sold 25 grams of heroin to BROOKS, who then sold that heroin to MARTIN and KIND; (2) on March 3, 2017, GOODSON sold 100 grams of heroin to BROOKS, who then sold that heroin to Individual A; and (3) on March 9, 2017, GOODSON sold 98.6 grams of heroin to BROOKS, who then sold that heroin to MARTIN and KIND.

**A.      On March 3, 2017, GOODSON Sold 25 Grams of Heroin to BROOKS and BROOKS Sold That Heroin to MARTIN and KIND**

7.      On March 3, 2017, at approximately 11:48 a.m., law enforcement

intercepted a telephone call between BROOKS,[2] who was using Target Phone 1, and a male subsequently identified as RONNIE R. MARTIN,[3] also known as "Ronnie Bo," who was using telephone number 414-627-2220 ("Martin Phone 1") (session #1538). During the call, BROOKS, who was located in the Chicago area, negotiated the sale of a Saab vehicle, along with 25 grams of heroin, to MARTIN who was located in Milwaukee, Wisconsin. During the conversation, MARTIN asked BROOKS whether "you can take the rest of what I owe out of that 2 and could you send them [two female couriers MARTIN was sending to pick up the Saab and the heroin] back with, uh, like, uh 25 [grams of heroin] from your people."[4] BROOKS responded, "[y]eah, but I

---

[2] Law enforcement identified BROOKS's voice based upon CS-1's identification (as a result of his familiarity with BROOKS and recognition from prior in person meetings and phone conversation), as well as law enforcement's comparison with prior consensually recorded phone conversations between CS-1 and BROOKS, prior intercepted communications (on December 7, 2015, U.S. District Court Judge Lynn Adelman for the Eastern District of Wisconsin authorized the interception of wire and electronic communications to, and from, phone number 630-880-9242 ("Brooks Phone 1") for a 30-day period), and physical surveillance of BROOKS (in conjunction with those recorded and intercepted communications). Subscriber information for Target Phone 1 also revealed that the telephone number was subscribed to Individual B, believed to be BROOKS's girlfriend.

[3] Subscriber information for Martin Phone 1 showed that it was a prepaid account subscribed to a "Sam Doe" at an address in Milwaukee. Based upon my training and experience, I know that those involved in drug trafficking sometimes will use prepaid accounts, false subscriber names, or no subscriber name in order to avoid detection by law enforcement.

As set forth in more detail below, law enforcement identified MARTIN's voice based upon physical surveillance (in conjunction with intercepted communications), prior field interviews by agents/officers, and comparison with MARTIN's video and audio recorded post-arrest interview on March 9, 2017. As part of its investigation, law enforcement had identified MARTIN as one of BROOKS's heroin customers based in Milwaukee, Wisconsin.

[4] Some of the consensually-recorded conversations and meetings, as well as intercepted wire and electronic communications (the "recorded conversations") have been summarized in this Affidavit. I based the language quoted from the recorded conversations throughout this Affidavit on a preliminary review of the recorded conversations—and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversation. At various points in

ain't goin' call them [BROOKS was not going to call his heroin supplier] 'til I got the bread [money] in my hand." At approximately 12:16 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN (session #1541), who was using Martin Phone 1, during which MARTIN told BROOKS that one of the female couriers was "at the bank [obtaining the money to pay for the Saab and heroin]," to which BROOKS said "Alright, yeah, I'm a grab it [heroin] for you."

8.    At approximately 12:38 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and a male, later identified as ROBERT GOODSON,[5] who was using telephone number 773-217-2248 ("Goodson Phone 1") (session #1546). During the call, BROOKS asked GOODSON "you feel like taking on 25th street? [BROOKS was asking whether GOODSON would sell him 25 grams of heroin]," to which GOODSON responded, "I'm in the 'burbs. As soon as I leave the 'burbs godamn it I will [GOODSON would sell BROOKS the heroin after he left the suburbs]. When BROOKS asked GOODSON, "Okay, cool. How long you goin'

---

this Affidavit, I have included in brackets my interpretation of words and phrases used during the recorded conversations. I based my interpretations on the content and context of the recorded conversations, events occurring before or after the recorded conversations, information received from confidential sources, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation.

[5] Subscriber information for Goodson Phone 1 showed that it was a prepaid account subscribed to Locus Communications at an address in New Jersey. As noted below, law enforcement identified GOODSON based upon the content of the intercepted communications setting up a meeting on March 3, 2017, physical surveillance of that meeting, vehicle registration records, and a comparison of a surveillance photo of the person who met with BROOKS on March 3, 2017, with a driver's license photo for GOODSON.

be? Like a hour or two or somethin?," GOODSON responded "No. Probably 'bout 40 minutes at the most. 40 minutes or a hour." BROOKS and GOODSON agreed that GOODSON would call him to arrange the meeting.

9.      Between 12:38 p.m. and 2:02 p.m., law enforcement intercepted approximately five phone calls and one text message during which BROOKS, who was using Target Phone 1, and GOODSON, who was using Goodson Phone 1 agreed to meet at a particular restaurant on the 4600 block of South Martin Luther King Drive in Chicago (sessions #1546, 1553, 1556, 1557, 1561, and 1563). At approximately 2:02 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and GOODSON, who was using Goodson Phone 1, during which GOODSON stated that he was arriving at the agreed-upon restaurant (session #1563).

10.      At approximately 2:02 p.m., law enforcement conducting physical surveillance of the restaurant saw a 2008 Audi SUV bearing Illinois license plate V834547 and VIN WA1BY74L28D041677 (the "GOODSON Vehicle") arrive at the restaurant.[6] Surveillance saw BROOKS exit the restaurant and enter the front passenger side of the GOODSON Vehicle. At approximately 2:04 p.m., surveillance saw BROOKS exit the front passenger side of the GOODSON Vehicle and return to the restaurant, while the GOODSON Vehicle left the area. Law enforcement conducted mobile surveillance on the GOODSON Vehicle (although interrupted for

---

[6] A query of Illinois Department of Transportation records revealed that the Audi was registered to GOODSON at an address in Chicago.

6

approximately ten to fifteen minutes), and later saw GOODSON, alone, exit the driver's side of the car near the intersection of 91st Street and Ashland in Chicago.[7]

11.     At approximately 4 p.m., law enforcement conducting physical surveillance of BROOKS saw him in a Saab outside of a car wash business near 20th and Halsted in Chicago, before losing surveillance of BROOKS and the Saab shortly thereafter.[8]

12.     At approximately 4:26 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN (session #1584), who was using Martin Phone 1, during which BROOKS told MARTIN that MARTIN owed him "couple hundred dollars" and that "she gave me 6250 [one of MARTIN's couriers gave BROOKS $6,250 for the Saab and 25 grams of heroin]."

### B.     On March 3, 2017, GOODSON Sold 100 Grams of Heroin to BROOKS

13.     On February 28, 2017, law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and a heroin customer located in Milwaukee, Individual A (session #1295). During the call, BROOKS told Individual A, "as long as (UI) a hundred yard dash [100 grams of heroin], a full length one," to which Individual A responded, "no, that's what we usually do." Later during the call,

---

[7] Law enforcement was able to identify GOODSON as the driver based upon a comparison of a photograph taken of GOODSON during surveillance and an Illinois driver's license photo maintained by the Illinois Secretary of State.

[8] At approximately 3:09 p.m., law enforcement intercepted a phone call between BROOKS, who was using Target Phone 1, and an unidentified male ("UM1-1569"), during which BROOKS told UM1-1569 that he was "going to sell the Saab" and that he was "at the car wash on 20th and Halsted" (session #1569).

when BROOKS told Individual A, "thought the motherfucker was talking about something else," Individual A stated, "no, just that." BROOKS then told Individual A, "alright, I'll call you when I get back local [BROOKS would call Individual A when he got back to Chicago]. Based upon the circumstances of the intercepted call, my knowledge of the investigation, and my training and experience, I believe that during this call, Individual A was attempting to place an order for 100 grams of heroin from BROOKS.[9]

14.     On March 3, 2017, at approximately 6:45 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and Individual A (session #1624), during which they arranged to meet the next day in Milwaukee.

15.     Several minutes later, beginning at approximately 6:48 p.m. and ending at approximately 7:01 p.m., on March 3, 2017, law enforcement intercepted several text messages between BROOKS, who was using Target Phone 1, and GOODSON, who was using Goodson Phone 1 (session #1627, 1629, 1631, 1633, 1635, 1637, 1639, 1641, 1643, 1645, 1647, 1649, 1651, 1653, 1655, 1657, 1661, 1663, and 1665).[10] During the exchange, at approximately 6:48 p.m., Target Phone 1 sent a text message to

---

[9] On March 4, 2017, law enforcement intercepted a telephone call between BROOKS who was using Target Phone 1, and MARTIN (session #1738), during which BROOKS told MARTIN "somebody else had asked me to grab a hundred [100 grams of heroin]." Based upon the circumstances of the intercepted call, my knowledge of the investigation, and my training and experience, I believe BROOKS was referring to Individual A ordering one hundred grams of heroin from BROOKS.

[10] The monitoring software registered duplicate session numbers for each text message sent or received by Target Phone 1.

Goodson Phone 1 stating, "yo," to which Goodson Phone 1 responded, "[w]hat up" (session #1627, 1629). At approximately 6:49 p.m., Target Phone 1 sent a text message to Goodson Phone 1 stating, "Tryna go to the 100's [BROOKS wanted to buy 100 grams of heroin]," to which Goodson Phone 1 responded "[h]ow many" (session #1631, 1633). At approximately 6:50 p.m., Target Phone 1 sent a text message to Goodson Phone 1 stating, "100," to which Goodson Phone 1 responded "wya [where you at?]" (session #1635, 1637). According to texts exchanged between Target Phone 1 and Goodson Phone 1, I believe BROOKS and GOODSON agreed to meet later that night. Although law enforcement was unable to conduct surveillance of a meeting, law enforcement believes BROOKS met with GOODSON that night and obtained 100 grams of heroin based upon communications intercepted, and surveillance conducted, the next day.

16.     On March 4, 2017, law enforcement intercepted multiple telephone calls between BROOKS, who was using Target Phone 1, and Individual A (session #1734, 1762, 1764, 1765, 1767, 1768, and 1769), during which BROOKS and Individual A agreed to meet at a particular tire shop located on the 800 block of West Atkinson Street in Milwaukee because BROOKS was experiencing tire problems.

17.     At approximately 5:00 p.m., law enforcement conducting physical surveillance saw a 2003 white Infiniti 4-door sedan bearing Illinois license plate Z801540 and VIN JNKBF01A73M100185 associated with BROOKS ("BROOKS

Vehicle")[11] arrive at the tire shop.[12] Shortly thereafter, law enforcement saw a gray BMW bearing a particular Wisconsin license plate number[13] arrive at the tire shop before departing at approximately 5:17 p.m. While the BROOKS Vehicle was being repaired, law enforcement saw an African-American male, believed to be BROOKS, enter and exit the backseat of the BROOKS Vehicle. At approximately 5:33 p.m., law enforcement saw the BROOKS Vehicle leave the tire shop.

18.    At approximately 5:34 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and Individual A (session #1782), during which Individual A told BROOKS, "I'm right behind you." At approximately 5:36 p.m., surveillance saw the BROOKS Vehicle and the gray BMW parked together at a particular tobacco shop located on the 1900 block of West Capitol Avenue in Milwaukee. Surveillance saw both the BROOKS Vehicle and the gray BMW at the tobacco shop for less than a minute before both cars departed the area. Shortly thereafter, at approximately 6:01 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and Individual A (session #1795), during which Individual A told BROOKS "man, that motherfucker

---

[11]    A query of Illinois Department of Transportation records revealed that the Infiniti was registered to Brooks, at an address in Chicago. Law enforcement conducting physical surveillance has also seen BROOKS in the Infiniti in multiple locations, including the parking area of his residence.

[12]    Between February 24, 2017, and March 4, 2017, law enforcement had intercepted multiple communications between BROOKS, who was using Target Phone 1, and other individuals related to the purchasing and sale of cars. Law enforcement also saw BROOKS in other vehicles including a Malibu and a Saab.

[13]    A query of Wisconsin Department of Transportation records revealed the BMW was registered to an individual associated with the spouse of Individual A.

didn't go all the way, huh?" to which BROOKS responded, "ya, I'm pretty sure." Based upon the circumstances of the intercepted call, my knowledge of the investigation, and my training and experience, I believe that Individual A and BROOKS were discussing whether the quantity of heroin provided by BROOKS, and supplied by GOODSON, was correct.

**C. Counts 1-3: On March 9, 2017, GOODSON Sold 98.6 Grams of Heroin to BROOKS and BROOKS Sold that Heroin to MARTIN and KIND**

19. On March 8, 2017, at approximately 12:09 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 1 (session #2144). During the call, MARTIN told BROOKS that "yeah, I'm gonna probably try and grab 50 real quick [MARTIN wanted to buy 50 grams of heroin from BROOKS]." After BROOKS asked "about what?," MARTIN responded "about 50 [grams of heroin]. If not, something close to it." BROOKS then told MARTIN "I'll find out whenever you get here [BROOKS would order the quantity of heroin when MARTIN arrived in Chicago with the money]." BROOKS and MARTIN agreed to speak later.

20. At approximately 5:49 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 1 (session #2172), during which MARTIN told BROOKS, "it's gonna be for sure 50 [grams of heroin], depending on what she do, it might be 100 [MARTIN would buy at least 50 grams of heroin and possibly 100 from BROOKS]." MARTIN told BROOKS he would call him later.

11

21. The next day, on March 9, 2017, at approximately 12:42 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using 414-213-8933 ("Martin Phone 2")[14] (session #2238), during which BROOKS asked MARTIN "you figure out what you was trying to do? [BROOKS was asking whether MARTIN knew how much heroin he wanted to order]" to which MARTIN responded, "I know how you work, so I might as well not even say shit 'til I get out there. Come hang out with you for a second and we'll figure it out when I get there [MARTIN would tell BROOKS how much heroin he wanted to order once he arrived in Chicago with the money]."

22. At approximately 4:23 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 2 (session #2274), during which MARTIN told BROOKS, "I'm leaving out in route to you right now [Martin was leaving Milwaukee to drive to Chicago]," and BROOKS told MARTIN "Alright, I'mma call him right before you get here. I'll make sure he got it on point [BROOKS would call his heroin supplier before MARTIN arrived in Chicago]."

23. At approximately 4:30 p.m., law enforcement intercepted a text message that BROOKS, using Target Phone 1, sent to GOODSON, who was using Goodson Phone 1 (session #2278). The text message stated, "Tryna drive that same car

---

[14] Subscriber information for Martin Phone 2 showed that it was a prepaid account with no subscriber identified. As noted previously, law enforcement identified MARTIN's voice based upon physical surveillance (in conjunction with intercepted communications), prior field interviews by agents/officers, and comparison with MARTIN's video and audio recorded post-arrest interview on March 9, 2017.

[BROOKS wanted to place another order for 100 grams of heroin]." At approximately 4:35 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and GOODSON, who was using Goodson Phone 1 (session #2281). During the call, BROOKS told GOODSON "trying to go that same place I went to last time [BROOKS wanted to place the same order for 100 grams of heroin]." GOODSON told BROOKS that he was in Indiana and would call BROOKS later.

24.     At approximately 4:52 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 1 (session #2282). During the call, BROOKS told MARTIN "I'm waiting for you. I'm at my crib on the low end [BROOKS was waiting for MARTIN at his house]." MARTIN told BROOKS he would call him when he was closer. At approximately 6:20 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 1 (session #2284), during which MARTIN stated, "I'm about 20 minutes away, so you should have your peeps on stand by [MARTIN was close to BROOKS and wanted BROOKS to contact his heroin supplier]." At approximately 6:54 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 1 (session #2291), during which MARTIN told BROOKS, "I'm pulling up" and BROOKS told MARTIN to "go and park, I'mma let you up."

25.     At approximately 7:11p.m., law enforcement conducting physical

surveillance of a residence associated with BROOKS ("BROOKS Residence")[15] saw a Saab bearing Wisconsin license plate number 279ZTT arrive and park on the street near the BROOKS Residence. Surveillance then saw MARTIN and a female, subsequently identified during a traffic stop as ZHANE KIND, exit the Saab and walk to the entrance of the apartment complex for the BROOKS Residence. Surveillance saw MARTIN momentarily return to the Saab before returning to the BROOKS Residence.

26. At approximately 7:58 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and GOODSON, who was using Goodson Phone 1 (session #2292). During the call, GOODSON told BROOKS "gimme about 40 minutes. I'll be ready for you [GOODSON would be ready to meet BROOKS in about 40 minutes]."

27. At approximately 8:40 p.m., law enforcement conducting physical surveillance near the BROOKS Residence saw a Dodge Charger bearing Illinois license plate number S165407[16] arrive and park in the parking lot of a restaurant located approximately one block from the BROOKS Residence.[17] Surveillance then

---

[15] As noted above, on December 7, 2015, U.S. District Court Judge Lynn Adelman for the Eastern District of Wisconsin authorized the interception of wire and electronic communications to, and from, Brooks Phone 1 for a 30-day period. Among the calls that law enforcement intercepted were calls during which BROOKS provided that address as his own.

[16] A query of Illinois Department of Transportation records revealed that the Charger was registered to a rental car company.

[17] At approximately 8:40 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and Individual C (session #2324), during which BROOKS told Individual C that he was at that restaurant.

14

saw BROOKS, MARTIN, and KIND exit the Charger.

28.     Between approximately 8:21 and 8:56 p.m., law enforcement intercepted approximately eleven text messages and one telephone call between BROOKS, who was using Target Phone 1, and GOODSON, who was using Goodson Phone 1 (sessions #2300, 2302, 2304, 2306, 2310, 2312, 2325, 2327, 2329, 2331, 2333, 2335), during which BROOKS instructed GOODSON to meet him at the particular restaurant identified in paragraph 24.

29.     At approximately 8:45 p.m., law enforcement conducting physical surveillance at the particular restaurant saw the GOODSON Vehicle arrive and park approximately two spaces away from the Charger. At approximately 9:00 p.m., surveillance then saw BROOKS, MARTIN, and KIND exit the restaurant and enter the Charger. Surveillance then saw BROOKS exit the driver's side of the Charger and enter the front passenger side of the GOODSON Vehicle. Approximately one minute later, surveillance saw BROOKS exit the GOODSON Vehicle and return to the driver's side of the Charger before both the Charger and the GOODSON Vehicle drove off in separate directions.

30.     Law enforcement maintained mobile surveillance of the Charger and saw it drive back towards the parked Saab. At approximately 9:03 p.m., surveillance saw MARTIN and KIND exit the Charger and enter the Saab. Surveillance then saw the Charger enter the parking area of the BROOKS Residence. Surveillance was maintained on the Saab as it left the area before returning to the BROOKS Residence

a short time later.[18] At approximately 9:19 p.m., law enforcement saw MARTIN exit the Saab and enter the apartment complex for the BROOKS Residence. At approximately 9:22 p.m., law enforcement saw MARTIN exit the apartment complex for the BROOKS Residence and re-enter the Saab. Law enforcement maintained mobile surveillance, without interruption, on the Saab as it left the area and drove to Milwaukee, Wisconsin.

31.     At approximately 11:30 p.m., DEA, with assistance from state law enforcement and based upon the intercepted communications and surveillance, executed a traffic stop of the Saab in Milwaukee. Law enforcement took KIND,[19] who was in the driver's seat of the Saab, and MARTIN, who was in the front passenger seat, into custody. When law enforcement searched the Saab, they found a purse, located on the front passenger seat where MARTIN was previously sitting. Inside the purse, law enforcement found a black plastic shopping bag that held a clear plastic baggie containing a brown and black chunky substance.[20] After being advised of their *Miranda* rights and waiving those rights, both MARTIN and KIND, who were interviewed separately told law enforcement that the heroin had been purchased that

---

[18]     At approximately 9:14 p.m., law enforcement intercepted a telephone call between BROOKS, who was using Target Phone 1, and MARTIN, who was using Martin Phone 1 (session #2337), during which MARTIN told BROOKS that MARTIN left his eyeglasses inside the BROOKS Residence.

[19] Law enforcement identified KIND based upon her driver's license, which was found in her purse near the bag of heroin, and her self-identification during her post-arrest interview.

[20] The substance was submitted to DEA's North Central laboratory for analysis. The substance was identified as heroin with a net weight of approximately 98.6 grams.

evening in Chicago from an individual they knew as "G-Man," and "Big Bro," respectively. According to MARTIN and KIND, they met with that individual in Chicago, they subsequently went to a nearby restaurant, that individual met with another individual to obtain the heroin, that individual provided that heroin to MARTIN and KIND, and KIND then put it in her purse. KIND also acknowledged traveling to Chicago previously to purchase a Saab and 25 grams of heroin from the individual she knew as "Big Bro." Law enforcement released MARTIN and KIND so as not to compromise the ongoing investigation.

      32.    I submit that there is probable cause to support a complaint charging that on or about March 9, 2017, at Chicago, in the Northern District of Illinois, and elsewhere: (1) ROBERT GOODSON knowingly distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance; (2) RONALD R. BROOKS knowingly distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin a Schedule I Controlled Substance; and (3) RONNIE R. MARTIN and ZHANE KIND knowingly and intentionally possessed with the intent to distribute a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, all in violation of

Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
CHRISTIANA A. OLAGBAIYE
Special Agent, Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on September 13, 2017.

_____
MICHAEL T. MASON
United States Magistrate Judge

18